Filed 10/26/23  Baltazar v. Ace Parking Management CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| GLORIA BALTAZAR, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ACE PARKING MANAGEMENT, INC. et al., <br><br> Defendants and Appellants. | D081483 <br><br><br> (Super. Ct. No. 37-2021-00023736-CU-OE-CTL) |

APPEAL from an order of the Superior Court of San Diego County, James A. Mangione, Judge.  Reversed with instructions.

Schwartz Semerdjian Cauley & Evans, Dick A. Semerdjian, Sarah Brite Evans and Mary R. Powell for Defendants and Appellants.

GrahamHollis, Graham S.P. Hollis, Vilmarie Cordero and Dawn M. Berry for Plaintiff and Respondent.


INTRODUCTION

This is an action brought under the Labor Code Private Attorneys General Act of 2004 (PAGA) (Lab. Code, § 2698 et seq.) by Gloria Baltazar against Ace Parking Management, Inc., Ace Parking, Inc., and Ace Parking

Facilities, Inc. (collectively, Ace Parking). Within her complaint, Baltazar asserts a single cause of action under PAGA based on Labor Code violations she suffered personally (individual PAGA claims) and Labor Code violations suffered by other Ace Parking employees (non-individual PAGA claims). Ace Parking moved to compel arbitration of Baltazar's individual PAGA claims pursuant to a written agreement in which Baltazar agreed to arbitrate "all disputes that may arise out of or be related in any way to [her] employment." The trial court denied Ace Parking's motion based on a provision in the parties' arbitration agreement that allowed "a representative claim under the [PAGA]" to proceed in court "pending resolution of claims that are arbitrable."

Upon independently reviewing the arbitration agreement, we conclude Baltazar's individual PAGA claims are covered by a clause requiring arbitration of "all disputes that may arise out of or be related in any way to [her] employment." Although there are subsequent provisions in the agreement that carve out certain claims from arbitration, two are ambiguous as to whether they withdraw Baltazar's individual PAGA claims from the scope of arbitration. Because the agreement specified arbitration would be conducted under the Federal Arbitration Act, we construe the ambiguity in favor of arbitration pursuant to controlling United States Supreme Court authority requiring us to do so. We determine a third carve-out provision in the agreement is properly interpreted not to encompass Baltazar's individual PAGA claims. Because the parties' agreement to arbitrate plainly encompasses her individual PAGA claims, and no other provision in the agreement clearly exempts them from arbitration, the trial court erred by denying Ace Parking's motion. We reverse.

2

FACTUAL AND PROCEDURAL BACKGROUND

I.

*The Parties' 2019 Arbitration Agreement*

From May 2013 until March 2020, Baltazar worked as a shuttle bus driver for Ace Parking. In August 2019, she signed a "Team Member Acknowledgement and Agreement" presented to her by Ace Parking. Paragraphs 2 through 5 of this document set forth the terms of an arbitration agreement (arbitration agreement or agreement).

Paragraph 2 of the agreement opened with a provision stating, "I and the Company[1] agree to utilize binding individual arbitration as the sole and exclusive means to resolve all disputes that may arise out of or be related in any way to my employment." Paragraph 2 further provided that arbitration would be conducted "under the Federal Arbitration Act ([FAA]), in conformity with the procedures of the California Arbitration Act[.]" After describing the scope of disputes subject to the agreement to arbitrate (which included "all disputes, whether based on . . . statute . . . or otherwise"), it went on to state: "The only exceptions to binding arbitration shall be for claims arising under the National Labor Relations Act which are brought before the National Labor Relations Board, claims for medical and disability benefits under the California Workers' Compensation Act, Employment Development

---

1    The agreement defines "Company" to mean Ace Parking Management, Inc. In moving to compel arbitration, Ace Parking took the position the other two Ace Parking defendants (Ace Parking, Inc. and Ace Parking Facilities, Inc.) were entitled to enforce the agreement on the ground they were express beneficiaries or intended third party beneficiaries of the agreement. Baltazar has not disputed this position. As this point has been conceded, we treat the agreement as applying to disputes with all three Ace Parking entities.

Department claims, or other claims that are not subject to arbitration under current law."

Paragraph 3 of the agreement provided in full: "I agree that any claims brought under this binding arbitration Agreement shall be brought in the individual capacity of myself only, and, similarly, any claims brought under this binding arbitration Agreement by the Company shall be brought by the Company only. This binding arbitration Agreement shall not be construed to allow or permit the consolidation or joinder of claims of other claimants, or permit such claims to proceed as a class or collective action. No arbitrator shall have the authority under this agreement to order any such class or collective action. Any dispute regarding the validity, scope or enforceability of this Agreement shall be resolved by a court, not by the arbitrator. By signing this agreement, I am agreeing to waive any substantive or procedural rights that I may have to bring or participate in an action brought on a class or collective basis. If under applicable law a representative claim under the California Private Attorneys General Act ('PAGA') is found to be unwaivable and such an action is pursued in court, I and the Company agree that any such PAGA claim will be severed and stayed pending resolution of claims that are arbitrable."

Paragraph 4 of the agreement addressed selection of an arbitrator, procedures that would apply during arbitration, and other matters not at issue here.

Paragraph 5 of the agreement stated in its entirety: "If any term or provision or any portion of this Agreement is deemed invalid or unenforceable, it shall be severed and the remainder of this Agreement shall be enforceable. Under no circumstances shall this Agreement be construed to allow arbitration on a class, collective, representative or other similar basis."

4

## II.

### Trial Court Proceedings

A.    *Baltazar Files a PAGA Action Against Ace Parking*

In 2021, after Baltazar's attorney first gave notice to Ace Parking as well as the Labor and Workforce Development Agency (LWDA) pursuant to Labor Code section 2699.3, Baltazar initiated a lawsuit against Ace Parking. Her complaint was titled, "REPRESENTATIVE ACTION FOR CIVIL PENALTIES PURSUANT TO THE [PAGA]," and stated in its opening line that Baltazar was bringing the action in "her representative capacity." The complaint contained a single cause of action under PAGA based on numerous alleged wage-and-hour and meal- and rest-period Labor Code violations assertedly suffered by Baltazar and other non-exempt Ace Parking employees, as well as alleged violations of Ace Parking's obligations under the Labor Code to maintain or furnish accurate records and wage statements. As the sole remedy for the claimed Labor Code violations, Baltazar sought recovery of civil penalties on behalf of herself and other aggrieved employees.

B.    *Ace Parking's Motion to Compel Arbitration*

In September 2022, Ace Parking moved to compel arbitration of Baltazar's "[i]ndividual PAGA [c]laims" and to dismiss her "[n]on-[i]ndividual PAGA claims" pursuant to the arbitration agreement. Ace Parking argued the agreement was governed by the FAA. As such, the United States Supreme Court's decision in *Viking River Cruises, Inc. v. Moriana* (2022) 596 U.S. ___ [142 S.Ct. 1906] (*Viking River*) preempted the California Supreme Court's decision in *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348 (*Iskanian*) to the extent *Iskanian* had been interpreted as prohibiting courts from compelling a plaintiff-employee to arbitrate the individual component of a single-count PAGA claim. Ace Parking asserted

5

that Baltazar's individual PAGA claims fell within the provision of paragraph 2 requiring arbitration of "any claim . . . that I may have against the Company" and did not fall within any contractual exception to arbitration. Relying on *Viking River*, which held as a matter of California law that a plaintiff-employee's non-individual PAGA claims must be dismissed for lack of standing after her individual PAGA claims are sent to arbitration, Ace Parking asked the court to issue an order (1) compelling Baltazar to arbitrate her individual PAGA claims, and (2) dismissing her non-individual PAGA claims.

C.    *Baltazar's Opposition to the Motion*

Baltazar responded that even in arbitration agreements governed by the FAA, whether the agreement requires arbitration of a particular controversy is a question determined under state law. She claimed her agreement with Ace Parking could not be enforced as a matter of state law because it was procedurally and substantively unconscionable, including because in 2013 she executed a different arbitration agreement with Ace Parking that, unlike the 2019 arbitration agreement, contained a provision stating, "I expressly agree to waive any right I may have to bring an action on a class, collective, private attorney general, representative or other similar basis, unless I check this box[.]" Baltazar had checked the box, thereby opting out of the waiver. She argued the presence of this opt-out provision in the 2013 arbitration agreement, and absence of any similar provision in the 2019 arbitration agreement, was a factor that made the latter agreement unconscionable.

Baltazar also argued that to the extent the current arbitration agreement was enforceable, it did not require arbitration of her individual PAGA claims. She conceded "the parties agreed 'to utilize binding individual

6

arbitration as the sole and exclusive means to resolve all disputes that may arise out of or be related in any way to [her] employment.' " However, she claimed her individual PAGA claims fell within the agreement's exceptions to arbitration.

Specifically, she argued the parties had agreed in paragraph 3 of the agreement "that representative claims were categorically excluded from arbitration." Her claims, she asserted, fell within the language of paragraph 2 that excepted from arbitration "claims that are not subject to arbitration under current law." And "current law" encompassed *Iskanian*, which was controlling California Supreme Court precedent in August 2019 when the agreement was formed. Because *Iskanian* then "prohibited PAGA claims from being compelled into arbitration," Baltazar argued the parties could not have intended to require arbitration of her individual PAGA claims.

Finally, to the extent the trial court was inclined to compel any portion of her PAGA claims to arbitration, Baltazar argued *Viking River*'s standing determination was decided as a matter of state law and was therefore not binding on California courts. She observed that the California Supreme Court had recently granted review to address the standing question in *Adolph v. Uber Technologies, Inc.* (Apr. 11, 2022, G059860) [nonpub. opn.] [2022 WL 1073583, 2022 Cal.App.Unpub. Lexis 2170], review granted (July 20, 2022, S274671). She asked the court to stay her non-individual PAGA claim pending the California Supreme Court's decision in that case.

D.    *The Trial Court's Ruling*

In November 2022, after an unreported hearing, the trial court issued a minute order denying Ace Parking's motion. The court observed that *Viking River* held *Iskanian*'s rule prohibiting wholesale waiver of representative standing to bring PAGA claims was not preempted by the FAA, and any such

7

waiver therefore remained invalid.  The court reasoned Baltazar had brought suit against Ace Parking "in a representative capacity only," and that the arbitration agreement "specifically excludes representative PAGA claims from the scope of the agreement, stating [in the last sentence of paragraph 3] that if a 'representative claim' under PAGA is found to be unwaivable-which it is-the parties agree to stay the PAGA claims pending arbitration of the arbitrable claims."

DISCUSSION

I.

*Relevant Law*

A.    *PAGA*

"Before 2004, the [LWDA] was responsible for collecting civil penalties for labor law violations.  The Legislature found, however, that the LWDA lacked sufficient resources to keep pace with the sheer number and gravity of offenses.  As a solution, PAGA was enacted to empower aggrieved employees to act as private attorneys general to prosecute and collect civil penalties on the state's behalf."  (*Nickson v. Shemran, Inc.* (2023) 90 Cal.App.5th 121, 127 (*Nickson*), citing *Arias v. Superior Court* (2009) 46 Cal.4th 969, 980 (*Arias*).)

Under PAGA, "an 'aggrieved employee' may bring a civil action personally and on behalf of other current or former employees to recover civil penalties for Labor Code violations.  [Citation.]  Of the civil penalties recovered, 75 percent goes to the [LWDA], leaving the remaining 25 percent for the 'aggrieved employees.' "  (*Arias*, *supra*, 46 Cal.4th at pp. 980–981, citing Lab. Code, § 2699, subds. (a), (i).)  An employee who brings an action under PAGA "does so as the proxy or agent of the state's labor law enforcement agencies."  (*Arias*, at p. 986.)  "In a lawsuit brought under the act, the employee plaintiff represents the same legal right and interest as

8

state labor law enforcement agencies—namely, recovery of civil penalties that otherwise would have been assessed and collected by the [LWDA]." (*Ibid.*)

B.    Iskanian

In *Iskanian*, the California Supreme Court reached two conclusions about PAGA actions that are relevant here. First, it held that "an employee's right to bring a PAGA action is unwaivable." (*Iskanian*, *supra*, 59 Cal.4th at p. 383.) A pre-dispute agreement to waive such rights would "disable one of the primary mechanisms for enforcing the Labor Code" and therefore violated public policy. (*Ibid.*) This prohibition on PAGA waivers was not preempted by the FAA, the *Iskanian* court reasoned, because "the FAA aims to ensure an efficient forum for the resolution of *private* disputes, whereas a PAGA action is a dispute between an employer and the state Agency." (*Iskanian*, at p. 384.)

Second, the *Iskanian* court "rejected the employer's argument that the particular waiver it drafted should be upheld because it only waived nonindividual PAGA claims and preserved the employee's right to arbitrate individual ones. [Citation.] Appellate courts interpreted this aspect of *Iskanian* 'as prohibiting splitting PAGA claims into individual and nonindividual components to permit arbitration of the individual claims.' " (*Nickson*, *supra*, 90 Cal.App.5th at p. 128.)

C.    Viking River

In June 2022, the United States Supreme Court issued its decision in *Viking River*, *supra*, 142 S.Ct. 1906, in which it considered whether the FAA preempted the *Iskanian* rules against waiver and splitting of PAGA claims.

Discussing PAGA, the high court observed that the vocabulary used to describe PAGA actions "tends to use the word 'representative' in two distinct ways[.]" (*Viking River*, *supra*, 142 S.Ct. at p. 1916.) "In the first sense,

9

PAGA actions are 'representative' in that they are brought by employees acting as representative—that is, as agents or proxies—of the State." (*Ibid.*) In this sense, " ' "*every* PAGA action is . . . representative[.]" ' " (*Ibid.*) In the second sense, "PAGA claims are also called 'representative' when they are predicated on code violations sustained by other employees." (*Ibid.*) "[W]hen the word 'representative' is used in the second way, it makes sense to distinguish 'individual' PAGA claims, which are premised on Labor Code violations actually sustained by the plaintiff, from 'representative' . . . PAGA claims arising out of events involving other employees." (*Ibid.*) The Court used the terms "individual" and "non-individual" to refer to the two types of PAGA claims. (See *id.* at p. 1924.)

*Viking River* held that *Iskanian*'s prohibition on the waiver of PAGA claims was not preempted by the FAA. The FAA, it explained, is concerned with enforcing the parties' choice to use arbitration as the forum and procedure for resolving their disputes, not with the substantive rights and remedies they seek to vindicate. (*Viking River*, *supra*, 142 S.Ct. at p. 1919.) "Thus, even after *Viking River*, a contractual waiver of the right to prosecute PAGA claims is unenforceable as against California public policy." (*Nickson*, *supra*, 90 Cal.App.5th at p. 129.)

*Iskanian*'s secondary rule prohibiting the splitting of PAGA claims did not survive the high court's scrutiny. This rule was preempted by the FAA, the Court held, because it "circumscribes the freedom of parties to determine 'the issues subject to arbitration' and 'the rules by which they will arbitrate[.]' " (*Viking River*, *supra*, 142 S.Ct. at pp. 1923, 1924.) More specifically, the rule conditions enforcement of an agreement to arbitrate individual PAGA claims "on the availability of a procedural mechanism . . . to expand the scope of the arbitration by introducing [non-individual PAGA]

10

claims that the parties did not jointly agree to arbitrate." (*Id.* at p. 1923.) The effect of the rule was to force the parties to such an agreement to forego arbitration of PAGA claims entirely, a result that was incompatible with the FAA. (*Id.* at p. 1924.)

Turning to the specific arbitration agreement at issue, the Supreme Court observed that it "purported to waive 'representative' PAGA claims." (*Viking River*, *supra*, 142 S.Ct. at p. 1924.) This waiver was unenforceable "if construed as a wholesale waiver of PAGA claims." (*Ibid.*) But there was a severability clause in the agreement providing that "if the waiver provision is invalid in some respect, any 'portion' of the waiver that remains valid must still be 'enforced in arbitration.' " (*Id.* at p. 1925.) Pursuant to this severability clause, Viking River Cruises was "entitled to enforce . . . arbitration of [the plaintiff's] individual PAGA claim." (*Ibid.*)

As for the non-individual PAGA claims that remained, the Supreme Court held they should be dismissed for lack of statutory standing. (*Viking River*, *supra*, 142 S.Ct. at p. 1925.) It reasoned that "[u]nder PAGA's standing requirement, a plaintiff can maintain non-individual PAGA claims in an action only by virtue of also maintaining an individual claim in that action. [Citation.] When an employee's own dispute is pared away from a PAGA action, the employee is no different from a member of the general public, and PAGA does not allow such persons to maintain suit." (*Ibid.*) Justice Sotomayor wrote separately to point out that if the majority's interpretation of the state law standing issue was wrong, "California courts, in an appropriate case, will have the last word." (*Id.* at p. 1925 (conc. opn. of Sotomayor, J.).)

11

D.    Adolph

In July 2023, while this appeal was pending, the California Supreme Court issued its decision in *Adolph v. Uber Technologies, Inc.* (2023) 14 Cal.5th 1104 (*Adolph*).[2]  On the question of whether an aggrieved employee who has been compelled to arbitrate individual PAGA claims maintains statutory standing to pursue non-individual PAGA claims in court, the *Adolph* court held the answer is "yes."  (*Id.* at p. 1114.)  *Adolph* explained PAGA standing has two requirements:  the "plaintiff must be an 'aggrieved employee'—that is, (1) 'someone "who was employed by the alleged violator" ' and (2) ' "against whom one or more of the alleged violations was committed." ' "  (*Ibid.*)  When a plaintiff brings an action asserting individual and non-individual PAGA claims,[3] "an order compelling arbitration of the individual claims does not strip the plaintiff of standing as an aggrieved employee to litigate claims on behalf of other employees under PAGA."  (*Ibid.*)  This is because "[a]rbitrating a PAGA plaintiff's individual claim does not nullify the fact of the violation or extinguish the plaintiff's status as an aggrieved employee[.]"  (*Id.* at p. 1121.)

Thus, a PAGA plaintiff who is compelled to arbitrate his or her individual PAGA claims maintains standing to assert the remaining non-individual PAGA claims in court.  (*Adolph*, *supra*, 14 Cal.5th at p. 1123.)  As a result, dismissal of the non-individual PAGA claims is not required when

---

[2]    On August 2, 2023, at our direction, the parties submitted supplemental letter briefs addressing the effect of *Adolph* on this appeal.

[3]    In *Adolph*, the California Supreme Court "use[d] the terms 'individual' and 'non-individual' [PAGA] claims in accordance with the high court's usage in *Viking River*."  (*Adolph*, *supra*, 14 Cal.5th at p. 1114.)

arbitration of individual PAGA claims is compelled. (*Ibid.*) Instead, "the trial court may exercise its discretion to stay the non-individual claims pending the outcome of the arbitration pursuant to section 1281.4 of the Code of Civil Procedure." (*Ibid.*)

E.    *Terminology*

This appeal requires us to interpret an arbitration agreement that uses the words "representative" and "individual" in certain key places. Because we have to determine whether and to what extent these terms apply to the present PAGA action, we are faced with the same fertile ground for confusion as the high court in *Viking River*.

Ace Parking suggests that instead of "individual PAGA claim" and "non-individual PAGA claim" we should use the labels "Type A" and "Type O." These labels were proposed in *Galarsa v. Dolgen California, LLC* (2023) 88 Cal.App.5th 639, 648. The *Galarsa* court adopted the label "Type A" to mean individual PAGA claims ("A" stands for "arbitrable"). The *Galarsa* court found "Type A" to be a logical designation because this type of PAGA claim "will be ordered to arbitration if it is covered by an arbitration agreement subject to the FAA." (*Id.* at pp. 648–649.) "Type O" claims are non-individual PAGA claims; the "O" means "other," as in the "claim involves a Labor Code violation suffered by an employee *other* than the plaintiff." (*Id.* at p. 649.)

We appreciate the clarity these labels stand to provide, however, we decline to use them here. The *Adolph* court, despite being aware of *Galarsa* (see *Adolph, supra,* 14 Cal.5th at pp. 1121–122), did not adopt its proposed nomenclature. Instead, to stay consistent with *Adolph* and *Viking River*, we will use "individual PAGA claims" to refer to the component of Baltazar's PAGA action that is based on Labor Code violations she allegedly suffered,

13

and "non-individual PAGA claims" to refer to the component of her PAGA action that is based on Labor Code violations allegedly suffered by other Ace Parking employees.

Although all PAGA claims are "representative" in the sense that "they are brought by employees acting . . . as agents or proxies . . . of the State" (*Viking River, supra,* 142 S.Ct. at p. 1916), using the word "representative" to denote this characteristic of PAGA claims is certain to cause confusion when we analyze the parties' agreement. So instead of "representative," we will use words like "agent" or "private attorney general" when we refer to this aspect of Baltazar's PAGA claim. And to distinguish claims or actions a plaintiff brings in her capacity as an agent of the state from claims or actions she brings in her personal capacity, we will use words like "personal" or "personal capacity" (instead of "individual" or "individual capacity") when we refer to the latter type of claim or action.

## II.

### *Contentions on Appeal*

Ace Parking contends the trial court erred by declining to compel Baltazar to arbitrate her individual PAGA claims. It believes the court was misled by Baltazar's complaint, which "artfully" alleged Baltazar was maintaining the action in her "representative capacity." It contends Baltazar's individual PAGA claims (which it refers to as "Type A" claims) are within the scope of the parties' arbitration agreement and under *Viking River* must be ordered to arbitration. To the extent we find the agreement to be ambiguous, Ace Parking urges us to resolve any doubts about the scope of arbitrable disputes in favor of arbitration.

Baltazar disputes that she has *not* sued "in her representative capacity"; she claims instead that she brought suit "solely in her

14

representative capacity." She contends her individual and non-individual PAGA claims are not among the disputes covered by the parties' arbitration agreement, because they fall within exceptions to arbitration set forth in paragraph 2 (excluding claims "not subject to arbitration under current law") and paragraph 3 (providing that if a "representative claim" under PAGA is "found to be unwaivable" and "is pursued in court, . . . any such PAGA claim will be severed and stayed pending resolution of claims that are arbitrable"). And to the extent we find the arbitration agreement to be uncertain, she argues any ambiguity must be construed against Ace Parking—and against arbitration—pursuant to Civil Code section 1654.[4]

As we have mentioned, Baltazar raised an unconscionability defense in the trial court. On appeal, however, she has not reasserted this defense. The substantive arguments in her respondent's brief on appeal only address the interpretation of the arbitration agreement and are devoid of any claim of unconscionability.

Indeed the word "unconscionable" appears in her brief just once, in a footnote within the procedural background section of her brief. In this footnote, she acknowledges that she argued in the trial court "the Agreement was procedurally and substantively unconscionable." She then states: "Because the trial court found that Ms. Baltazar's claim did not fall within the scope of the agreement, it did not address this argument. However, as set forth below, this Court may affirm the trial court's order on the basis of any valid legal theory, including a basis that was not invoked at the time." She

---

[4]    "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." (Civ. Code, § 1654.)

15

does not argue unconscionability in any other section of her brief, either before or after the footnote.

For several reasons, we do not regard this footnoted assertion as a reinvocation of her unconscionability defense. First, referring to a defense in a footnote of the procedural background section of a respondent's brief is not an adequate means of raising an appellate argument. "An appellant cannot bury a substantive legal argument in a footnote and hope to avoid waiver of that argument." (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 419; see also *Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947 ["Footnotes are not the appropriate vehicle for stating contentions on appeal."].) Second, Baltazar's suggestion that we "may affirm" on the basis of any valid theory does not amount to a cognizable or adequately developed argument. Our state's rules of appellate practice require every appellate brief to "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority." (Cal. Rules of Court, rule 8.204(a)(1)(B).)

Baltazar's footnoted assertion meets none of these requirements. It is frequently said that appellate courts "may and do 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt.'" (See, e.g., *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153.) But here, Baltazar has not made so much as even a conclusory argument; she has merely referenced a position she took in the trial court and then has alluded to the possibility that we might consider the merits of this position on our own. We decline to do so. An appellate court is "not required . . . to make arguments for parties." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.) As a result of

16

these briefing deficiencies, Baltazar has forfeited reliance on unconscionability as a basis for affirming the trial court's order.

Further, Baltazar's failure to provide any appellate argument at all on the merits of her unconscionability defense, much less an argument tailored to the applicable standard of review, operates as a concession the defense lacks merit. (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465 [" 'Arguments should be tailored according to the applicable standard of appellate review.' [Citation.] Failure to acknowledge the proper scope of review is a concession of a lack of merit."]; *Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699–700 ["When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned"].)

## III.

### *Additional Legal Principles*

A.    *Standard of Review and Relevant Contract Law*

"On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party to the agreement refuses to arbitrate that controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists[.]" (Code Civ. Proc., § 1281.2.) "In a petition to compel arbitration, 'the moving party, in essence, requests specific performance of a contractual agreement to arbitrate the controversy[.] The trial court must determine in advance whether there is a duty to arbitrate the controversy[.] This determination "necessarily requires the court to examine and, to a limited extent, construe the underlying agreement." ' " (*Gravillis v. Coldwell Banker Residential Brokerage Co.* (2006) 143 Cal.App.4th 761, 770–771.)

17

"Arbitration is strictly a matter of consent. A party cannot be required to arbitrate a dispute that he or she has not agreed to submit to arbitration." (*Duran v. EmployBridge Holding Co.* (2023) 92 Cal.App.5th 59, 65 (*Duran*).) " 'To determine whether a contractual arbitration clause requires arbitration of a particular controversy, the controversy is first identified and the issue is whether that controversy is within the scope of the contractual arbitration clause.' " (*Titolo v. Cano* (2007) 157 Cal.App.4th 310, 316 (*Titolo*).) "Whether the parties agreed to arbitrate all or a portion of 'the present controversy turns on the language of the arbitration clause.' " (*Duran*, at p. 65., quoting *EFund Capital Partners v. Pless* (2007) 150 Cal.App.4th 1311, 1320 (*EFund Capital Partners*).) " '[T]he terms of the specific arbitration clause under consideration must reasonably cover the dispute as to which arbitration is requested.' " (*Titolo*, at p. 317.) Where, as here, "the language of the arbitration provision is not in dispute and no conflicting extrinsic evidence is introduced, the trial court's decision as to arbitrability is reviewed de novo." (*Duran*, at p. 65.)

To determine whether the parties agreed to arbitrate Baltazar's individual PAGA claims, we apply general principles of California contract law. (*Vaughn v. Tesla, Inc.* (2023) 87 Cal.App.5th 208, 219 (*Vaughn*).) " ' " 'The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special

18

meaning is given to them by usage' [citation], controls judicial interpretation. [Citation.]" [Citations.] A [contract] provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. [Citation.] But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract.' " ' " (*EFund Capital Partners, supra,* 150 Cal.App.4th at p. 1321, quoting *TRB Investments, Inc. v. Fireman's Fund Ins. Co.* (2006) 40 Cal.4th 19, 27.)

B.  *Law Pertaining to the Resolution of Ambiguity in an Arbitration Agreement Governed by the FAA*

The parties dispute what rule we must apply to the extent we find the parties' agreement to be ambiguous after exhausting available methods of contract interpretation.

Ace Parking contends we must resolve any contractual ambiguity in favor of compelling arbitration. It relies on *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.* (1983) 460 U.S. 1 (*Moses H. Cone*), in which the United States Supreme Court stated, "The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." (*Id.* at pp. 24–25; accord, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth* (1985) 473 U.S. 614, 626; *Mastrobuono v. Shearson Lehman Hutton* (1995) 514 U.S. 52, 62, fn. 8; see also *AT&T Techs. v. Communs. Workers of America* (1986) 475 U.S. 643, 650 (*AT&T Techs.*) ["[I]t has been established that where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[an] order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not

19

susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage."]; *Granite Rock Co. v. Internat. Brotherhood of Teamsters* (2010) 561 U.S. 287, 298 (*Granite Rock*).)  California law incorporates the same interpretative rule based on our state's strong public policy of favoring arbitration.  (See *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 323 ["[i]n this state. . . [citation], doubts concerning the scope of arbitrable issues are to be resolved in favor of arbitration"]; *Duran, supra*, 92 Cal.App.5th at pp. 65–66 ["California has a strong public policy favoring arbitration and, as a result, ambiguities or doubts about the scope of the arbitration provision should be resolved in favor of arbitration"]; accord *Ahern v. Asset Management Consultants, Inc.* (2022) 74 Cal.App.5th 675, 687.)

Baltazar, on the other hand, asserts mutual consent is an element of any contract, " '[a]rbitration is strictly "a matter of consent" ' " (*Viking River, supra*, 142 S.Ct. at p. 1918, quoting *Granite Rock, supra*, 561 U.S. at p. 299) and "[t]here is no public policy favoring arbitration of disputes which the parties have not agreed to arbitrate" (*Engineers & Architects Assn. v. Community Development Dept.* (1994) 30 Cal.App.4th 644, 653).  To the extent the agreement is ambiguous with respect to the scope of disputes it requires to be arbitrated, she argues we must apply Civil Code section 1654 (section 1654).  As we have noted, section 1654 provides that "[i]n cases of uncertainty not removed [after exhausting other methods of interpretation set forth in Civil Code sections 1635 to 1653], the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist."  This provision codifies the common law principle of interpretation known as *contra proferentem*.  (See, e.g., *Mitchell v. Exhibition Foods* (1986) 184 Cal.App.3d 1033, 1042 [using *contra proferentem* as a

20

synonym for the rule embodied in section 1654].) Baltazar argues section 1654 requires us to construe any ambiguity in the arbitration agreement against Ace Parking (and therefore against compelling arbitration) because Ace Parking drafted the agreement.

As previously noted, the parties' agreement in this case "invoke[s] the coverage of the [FAA]." (*Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233, 250 (*Sandquist*).) Because the parties rely on competing federal and state rules of interpretation, their dispute presents a question of federal preemption. We must determine whether, to the extent there is a conflict between the federal rule for resolving ambiguity in an arbitration agreement and state law of contract interpretation, the state doctrine of *contra proferentem* (which here would require us to construe the agreement against arbitration) must yield to the federal rule requiring us to resolve doubts in favor of arbitration.

In *Sandquist*, the California Supreme Court relied on section 1654 *as well as* the federal and state policies favoring arbitration to construe an ambiguous arbitration agreement in favor of arbitration. The question in *Sandquist* was whether a court or an arbitrator should decide in the first instance whether the parties' agreement permitted arbitration on a classwide basis. (*Sandquist, supra*, 1 Cal.5th at p. 241.) The *Sandquist* court, after analyzing the relevant arbitration clauses, found them "by no means conclusive" with respect to the " 'who decides' " question. (*Id.* at p. 246.) *Sandquist* went on to find two "long-established interpretive principles" dispositive of the issue. (*Id.* at p. 247.) "First, under state law as under federal law, when the allocation of a matter to arbitration or the courts is uncertain, we resolve all doubts in favor of arbitration." (*Ibid.*) This presumption "tip[ped] the scales in favor of allocating the class arbitration

availability question to the arbitrator." (*Ibid.*) Second, under section 1654, "ambiguities in written agreements are to be construed against their drafters." (*Id.* at pp. 247–248.) Our high court stated this "general principle of contract interpretation applies equally to the construction of arbitration provisions. [Citations.] Where the drafter of a form contract has prepared an arbitration provision whose application to a particular dispute is uncertain, ordinary contract principles require that the provision be construed against the drafter's interpretation and in favor of the nondrafter's interpretation." (*Id.* at p. 248.) It concluded, "as a matter of state contract law," that "the parties' arbitration provisions allocate the decision on the availability of class arbitration to the arbitrator, rather than reserving it for a court." (*Ibid.*)

Because the parties' agreement "invoke[d] the coverage of the [FAA]," the Court then considered whether the state laws that compelled this result conflicted with policies underlying the FAA. (*Sandquist*, *supra*, 1 Cal.5th at pp. 250–260.) It answered this question in the negative, reasoning, in part, that its interpretation of the agreement was consistent with the "firmly established" federal principle " 'that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.' " (*Id.* at p. 255, quoting *Moses H. Cone*, *supra*, 460 U.S. at pp. 24–25.)

In *Sandquist*, *contra proferentem* and the federal rule for resolving doubts about the scope of arbitrable issues pointed to the *same* outcome, making it unclear which must yield in case of a conflict. In *Lamps Plus, Inc. v. Varela* (2019) 587 U.S.\_\_\_ [139 S.Ct. 1407] (*Lamps Plus*), the United States Supreme Court addressed what must occur when state contract principles and federal arbitration law are not aligned. There, the high court held that California's *contra proferentem* rule is preempted to the extent it conflicts

22

with federal policies underlying the FAA. In *Lamps Plus*, an employee brought claims against his employer on behalf of a putative class of employees whose tax information had been compromised in a data breach. (*Id.* at p. 1413.) The employee and employer were parties to an arbitration agreement governed by the FAA. (*Ibid.*) The Ninth Circuit, applying California contract law, found the agreement "ambiguous on the availability of class arbitration." (*Id.* at p. 1414.) Relying on *Sandquist* and the rule of *contra proferentem*, the Ninth Circuit construed the ambiguity against the employer because it had drafted the arbitration agreement, and held that the agreement authorized arbitration on a classwide basis rather than on an individual basis as sought by the employer. (*Id.* at p. 1413.)

The Supreme Court reversed. (*Lamps Plus*, *supra*, 139 S.Ct. at pp. 1417–1419.) Deferring to the Ninth Circuit's determination that the arbitration agreement was ambiguous, it focused on the appellate court's reliance on California's contract interpretation doctrine of *contra proferentem* to resolve that ambiguity in favor of class arbitration. The high court held applying *contra proferentem* to require class arbitration was inconsistent with federal policies favoring individual arbitration. (*Ibid.*)

The *Lamps Plus* court observed that while "courts may ordinarily [construe the terms of arbitration agreements] by relying on state contract principles, [citation], state law is preempted to the extent it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives' of the FAA." (*Lamps Plus*, *supra*, 139 S.Ct. at p. 1415.) And a rule of " 'fundamental importance' under the FAA" is that "arbitration 'is a matter of consent, not coercion.' " (*Ibid.*) Also, an "individualized form of arbitration [was] envisioned by the FAA," in which " 'parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private

23

dispute resolution:  lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes.' "  (*Id.* at p. 1416.)  "Class arbitration lacks those benefits" and is " 'crucial[ly] differen[t]' " from individual arbitration, the high court explained, because it " 'sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment.' "  (*Ibid.*)  Due to these differences, the Supreme Court explained, "courts may not infer consent to participate in class arbitration absent an affirmative 'contractual basis for concluding that the party *agreed* to do so.' "  (*Ibid.*)

Turning to the state doctrine of *contra proferentem*, the Supreme Court characterized it as a principle that "resolves the ambiguity [in an agreement] against the drafter based on . . . equitable considerations about the parties' relative bargaining strength."  (*Lamps Plus*, *supra*, 139 S.Ct. at p. 1417.)  The doctrine rests on public policy considerations, the high court explained, and does *not* help "interpret the meaning of a term, and thereby uncover the intent of the parties."  (*Ibid.*)  As applied by the Ninth Circuit, the doctrine was inconsistent with " 'the foundational FAA principle that arbitration is a matter of consent' " as well as the corollary rule that class arbitration must be based on consent and not " 'manufactured by [state law].' "  (*Id.* at pp. 1417–1418].)

The *Lamps Plus* majority claimed its decision was not a "watershed." (*Lamps Plus*, *supra*, 139 S.Ct. at p. 1418.)  It observed that in earlier cases, including *Moses H. Cone*, *supra*, 460 U.S. 1, it had "repeatedly held that ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration." (*Lamps Plus*, at pp. 1418–1419.)  The majority stated: "In those cases, we did not seek to resolve the ambiguity by asking who

24

drafted the agreement. Instead, we held that the FAA itself provided the rule. As in those cases, the FAA provides the default rule for resolving ambiguity here." (*Id.* at p. 1419.)

California appellate courts have followed *Lamps Plus* and have declined to apply *contra proferentem* to construe ambiguities in employer-drafted arbitration agreements governed by the FAA. (See, e.g., *Vaughn*, *supra*, 87 Cal.App.5th at p. 218, fn. 5 [observing that while *Sandquist* held " 'any ambiguities [in an arbitration agreement drafted by an employer] must be construed against the drafting employer and in favor of the nondrafting employee,' " "*Lamps Plus* . . . requires a different rule that we follow"]; *Western Bagel Co., Inc. v. Superior Court* (2021) 66 Cal.App.5th 649, 663–668 [trial court erred by construing in favor of the nondrafting employee an arbitration agreement that was ambiguous as to whether arbitration was to be binding or nonbinding; *Lamps Plus* "controls" this issue and compels the conclusion the employee "must submit his claims to binding arbitration"].) We must do the same. (*Karuk Tribe of Northern California v. California Regional Water Quality Control Bd., North Coast Region* (2010) 183 Cal.App.4th 330, 352 [state courts are bound by decisions of the United States Supreme Court in the construction and application of federal law].)

We note, however, that the question in *Lamps Plus* was whether class arbitration, which was disfavored as a matter of federal policy, could be ordered. Here, there is no comparable federal policy that disfavors arbitration of an individual PAGA claim. Instead, as *Viking River* held, arbitration of such a claim is not inconsistent with "the norm of bilateral arbitration as our precedents conceive of it." (*Viking River*, *supra*, 142 S.Ct. at p. 1921.) The federal policies implicated here are the policies that "arbitration 'is a matter of consent, not coercion' " (*Lamps Plus*, *supra*, 139

25

S.Ct. at p. 1415) and "ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration" (*id.* at pp. 1418–1419). *Lamps Plus* did not explain how to implement these seemingly conflicting policies at the same time.

We turn to *Granite Rock*, one of the cases relied on by Baltazar, in which the Supreme Court explained how the two policies are integrated in a case that required it to explore the outer bounds of the federal policy favoring arbitration. There, a local labor union (Local) argued an arbitration clause in a collective bargaining agreement (CBA) should be interpreted to require arbitration of a disputed issue as to the date the CBA was validly ratified. (*Granite Rock, supra,* 561 U.S. at pp. 291–292, 298.) Local claimed the breadth of the federal policy favoring arbitration compelled the conclusion that the formation-date question was arbitrable. (*Id.* at pp. 298–299.)

The *Granite Rock* court disagreed. "Our cases invoking the federal 'policy favoring arbitration' of commercial and labor disputes . . . recognize that, except where 'the parties clearly and unmistakably provide otherwise,' [citation], it is 'the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning' a particular matter, [citation]. They then discharge this duty by: (1) applying the presumption of arbitrability only where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand; and (2) adhering to the presumption and ordering arbitration only where the presumption is not rebutted." (*Granite Rock, supra,* 561 U.S. at p. 301.) In the case of the disputed issue regarding the date the CBA was ratified, two issues prevented the presumption of arbitrability from attaching. First, the issue called into question whether there was a CBA in place when the suit was filed, an issue that was "central to Local's arbitration

26

demand." (*Id*. at pp. 303–306.)  Second, the arbitration clause in the agreement was not ambiguous with respect to whether it covered Local's formation-date defense.  The provision in question, which was "narrow," called for arbitration of " '[a]ll disputes *arising under*' " the CBA, was "not fairly read to include a dispute about when the CBA came into existence." (*Id*. at pp. 307, 308.)  The agreement's remaining provisions further restricted the scope of arbitration and "all but foreclose[d]" reading the provision to cover Local's formation-date defense.  (*Id*. at p. 307.)  For these reasons, the *Granite Rock* court explained, "[t]he dispute here . . . falls outside the scope of the parties' arbitration clause on grounds the presumption favoring arbitration cannot cure."  (*Ibid*.)

Under the foregoing United States Supreme Court cases, we interpret the parties' agreement according to state law.  If, after applying state law rules of contract interpretation, we find the agreement to be ambiguous with regard to "whether it covers the dispute at hand"—Baltazar's individual PAGA claims—we must "apply[ ] the presumption of arbitrability" (*Granite Rock*, *supra*, 561 U.S. at p. 301) and resolve "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration" (*Moses H. Cone*, *supra*, 460 U.S. at pp. 24–25).  We then "adher[e] to the presumption and order[ ] arbitration only where the presumption is not rebutted."  (*Granite Rock*, at p. 301.)  Only if we can say " 'with positive assurance' " that the agreement " 'is not susceptible of an interpretation that covers the asserted dispute' " can an order compelling arbitration be denied.  (*AT&T Techs.*, *supra*, 475 U.S. at p. 650.)  And to the extent *contra proferentem* would require a different result than the foregoing interpretative rules, which reflect the federal policies at stake in this case, we must follow the federal rule rather

27

than the state rule. With these legal principles in mind, we address the parties' dispute.

## IV.

*The Trial Court Erred in Denying Ace Parking's Motion to Compel Arbitration*

A.    *Baltazar's Complaint for Civil Penalties Under PAGA Is "Representative" in Both Senses of the Word*

To determine whether the parties' agreement requires arbitration of the claims in Baltazar's complaint, we first resolve the parties' dispute as to whether, and to what extent, the claims in her complaint are properly described as either "representative" or "individual."

Baltazar's complaint contains a single cause of action under PAGA. She alleges, pursuant to PAGA, violations of the Labor Code suffered by herself as well as other Ace Parking employees. The Labor Code violations asserted within her PAGA cause of action are therefore "representative" in two ways. First, they are "representative" in that she is asserting them in her capacity as a private attorney general, representing the interests of the state. (See *Viking River*, *supra*, 142 S.Ct. at p. 1916 ["In the first sense, PAGA actions are 'representative' in that they are brought by employees acting as representatives—that is, as agents or proxies—of the State."].) Contrary to Ace Parking's suggestion the trial court was misled by artful pleading, there is nothing improper about Baltazar styling her complaint as a representative action, or alleging within the complaint that she is maintaining it in her "representative capacity." These are true and correct uses of the term "representative" to describe the action and the role in which she is maintaining it. (See *ibid.*)

Second, Baltazar's claims are "representative" to the extent they rely on alleged Labor Code violations sustained by employees other than herself and seek recovery of civil penalties as a result of those violations. (See *Viking*

28

*River*, *supra*, 142 S.Ct. at p. 1916 ["PAGA claims are also called 'representative' when they are predicated on code violations sustained by other employees"].)  These are the claims we are referring to as her "non-individual PAGA claims."  And her claims are also "individual" to the extent they rely on, and seek civil penalties as a result of, Labor Code violations she claims to have suffered personally.  These are the claims we are referring to as her "individual PAGA claims."

Although in her response brief on appeal, Baltazar appears to dispute that her complaint includes "individual claims," an examination of her arguments shows she is using this phrase in another, distinct way:  to refer to claims brought in her personal capacity, rather than in her capacity as a private attorney general.  She states, for example, that she does not "seek to recover damages or statutory penalties."  This is a reference to the remedies available to an employee who does *not* sue under PAGA.  In other words, PAGA does not authorize recovery of damages or statutory penalties.  " 'The civil penalties recovered on behalf of the state under the PAGA are distinct from the statutory damages to which employees may be entitled in their individual capacities.' "  (*Betancourt v. Prudential Overall Supply* (2017) 9 Cal.App.5th 439, 445, quoting *Iskanian*, *supra*, 59 Cal.4th at p. 381.)  By stating she has not brought any "individual claims," Baltazar is essentially saying that all of the claims in her complaint are claims for civil penalties under PAGA.  But this has never been in question.

Thus, there is no legitimate dispute here that Baltazar's PAGA action against Ace Parking is "representative" in that (1) Baltazar is maintaining it as an agent acting on behalf of the state (in other words, in that it has been brought under PAGA), and (2) it seeks, in part, to redress the rights of employees other than Baltazar.  The more difficult question is the one we

29

consider next—whether, and to what extent, Baltazar's individual PAGA claims fall within the scope of the disputes the agreement requires to be arbitrated.

B.     *Interpretation of the Arbitration Agreement*

1.     *Baltazar's Individual PAGA Claims Plainly Fall Within the Broad Scope of the Parties' Agreement to Arbitrate All Disputes That "[A]rise out of" and Are "[R]elated . . . to" Her Employment*

Ace Parking contends Baltazar's individual PAGA claims are reasonably covered by the provision in the parties' agreement obligating the parties "to utilize binding individual arbitration as the sole and exclusive means to resolve all disputes that may arise out of or be related in any way to [Baltazar's] employment."  Baltazar does not expressly dispute this position, arguing instead that her individual PAGA claims are excluded from arbitration by virtue of carve-outs created by subsequent provisions within the agreement.

We agree with Ace Parking's assertion, and Baltazar's implied concession, that the quoted provision encompasses Baltazar's individual PAGA claims.  "[U]se of the phrase 'arising from or relating to' signifies [an] [a]rbitration [p]rovision is a 'broad provision.' " (*Vaughn*, *supra*, 87 Cal.App.5th at p. 220, quoting *Khalatian v. Prime Time Shuttle, Inc.* (2015) 237 Cal.App.4th 651, 659.)  The phrase " 'relat[ed] to' " "acquires meaning from the subjects being related." (*Vaughn*, at p. 221.)  To determine whether Baltazar's individual PAGA claims are embraced by this language, we need only examine whether they "arise out of or [are] related in any way to" her employment.  It is self-evident that they are.  As we have discussed, Baltazar's individual PAGA claims arise from alleged Labor Code violations she personally suffered during her seven-year tenure as an Ace Parking employee.  The obligations she seeks to enforce are obligations Ace Parking

30

would not have owed her if it were not for her former status as its employee. Her individual PAGA claims are not just "related to" but are inextricably intertwined with her employment with Ace Parking. As a result, this provision clearly encompasses her individual PAGA claims.

2. *The Exception in Paragraph 2 for Claims Not Subject to Arbitration Under "[C]urrent [L]aw" Is Ambiguous as to Whether It Encompasses Baltazar's Individual PAGA Claims*

In opposing arbitration, Baltazar relies heavily on the provision in paragraph 2 of the agreement stating, "The only exceptions to binding arbitration shall be for claims arising under the National Labor Relations Act [(NLRA)] which are brought before the National Labor Relations Board [(NLRB)], claims for medical and disability benefits under the California Workers' Compensation Act [(WCA)], Employment Development Department [(EDD)] claims, or *other claims that are not subject to arbitration under current law*." (Italics added.)

Baltazar contends the italicized language expressly excludes all PAGA claims, including individual PAGA claims, from the scope of the disputes subject to arbitration. She observes that when she signed the agreement in August 2019, "*Iskanian* was 'current law,' " and under *Iskanian*, "an employee could not waive the right to bring a PAGA action nor could such an action be bifurcated into 'individual' and 'non-individual' parts." She contends the phrase "current law" must mean the law in existence when she signed the agreement, because paragraph 2 of the agreement "is largely written in the present tense." She contrasts the phrase "current law" in paragraph 2 with the phrase "applicable law" in paragraph 3, and contends the two phrases, being worded differently, must have different meanings. In her view, paragraph 3 "is largely written in the future tense" and is thus "clearly intended to refer to the law that applies at the time a dispute is

31

presented for adjudication"; therefore, "current law" as used in paragraph 2 must refer to an earlier time frame, namely, the date the agreement was signed.

We agree with Baltazar's premise that because the parties' arbitration agreement was formed in the present but anticipated future enforcement, the word "current" in the phrase "current law" can reasonably be taken to refer to either of those two time frames. Baltazar's argument also introduces the question whether "law" means statutes, or whether the term incorporates existing judicial decisions. Because the phrase "current law" is reasonably susceptible of two or more meanings, it is ambiguous. (*In re Tobacco Cases I* (2010) 186 Cal.App.4th 42, 48.)

However, Baltazar's arguments do not persuade us that "current law" is an unambiguous reference to the law in existence when she entered into the agreement. To the extent she contends the surrounding text "is largely written in the present tense," we do not agree with her. The provision she is relying upon actually begins by stating "[t]he only exceptions to binding arbitration *shall be* . . . ." (Italics added.) The word "shall" in the phrase "shall be" is "[u]sed to indicate simple futurity[.]" (American Heritage Dict. (2d. college ed. 1985) p. 1125, col. 2.) Although the provision then returns to the present tense when it states "or other claims that *are not* subject to arbitration under current law," it is not clear which time frame the present-tense phrase "are not" is meant to denote. (Italics added.) For example, one could say, "the only exceptions to taking the final exam *shall be* for students who *are* sick." The "are" in this context would clearly refer to the future test-taking, not the present discussion of it. The adjacent verb tenses do not clearly establish that the "current" in "current law" is meant to denote the time frame when the agreement was formed.

32

Baltazar also relies on the "meaningful-variation" canon of interpretation, but we do not find her application of the canon to be illuminating. The meaningful-variation canon provides that " '[w]here [a] document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea.' " (*Southwest Airlines Co. v. Saxon* (2022) 142 S.Ct. 1783, 1789, parenthetically quoting A. Scalia & B. Garner, Reading Law 170 (2012).) Baltazar observes that whereas the exception she is relying on uses the phrase "current law," the last sentence of paragraph 3 of the agreement uses the phrase "applicable law." She contends that "current law" must have a different meaning and denote a different time frame from "applicable law." She further contends that because "applicable law" as used in paragraph 3 is clearly referring to the stage when the agreement is enforced, "current law" must be interpreted to refer to the time when the agreement was formed.

The difficulty we have with Baltazar's reliance on the meaningful-variation canon is that we do not discern a meaningful difference between the phrases "current law" and "applicable law." A law is not "applicable" unless it is also "current." And a "current law" is not relevant to a given dispute unless it is also "applicable." Baltazar is deriving her conclusion that paragraph 3 refers to the future based on the context in which the phrase "applicable law" appears, not from the phrase itself. Thus, we do not agree with her that the use of the different phrases is determinative.

Instead, we find a different variation in the text of these two provisions to be meaningful. In paragraph 3 of the agreement, the parties referenced PAGA by name to address how claims under that statute were to be adjudicated. Their failure to do so in paragraph 2 within the provision

33

Baltazar is relying on tends to suggest it was not meant to encompass PAGA claims.

Also, in advancing her arguments about the meaning of "current law," Baltazar ignores a significant contextual feature: the phrase describes the "other claims" that, in addition to the specified claims that precede it, are excepted from the scope of disputes to be arbitrated. The *ejusdem generis* canon of interpretation is generally used to determine the intended meaning of a general term that follows a list of specific terms. Under this canon, " 'when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed.' " (*Wishnev v. The Northwestern Mutual Life Ins. Co.* (2019) 8 Cal.5th 199, 213; see *Gateway Community Charters v. Spiess* (2017) 9 Cal.App.5th 499, 504 ["*ejusdem generis* ('literally, "of the same kind" ')"].) *"Ejusdem generis* is typically applied to phrases that list several specific items, then refer to a general reference, using the term 'other.' " (*Zumbrun Law Firm v. California Legislature* (2008) 165 Cal.App.4th 1603, 1619.)

The specific claims in the list that precede the "other claims" also excepted from arbitration are claims under the NLRA "which are brought before the" NLRB; claims for medical and disability benefits under the WCA; and EDD claims. These are all claims the law requires to be resolved administratively. (See *Prime Healthcare Paradise Valley, LLC* (June 19, 2019) 368 NLRB No. 10, 2019 WL 2525342, *7 [holding it is an unfair labor practice under section 8 of the NLRA (29 U.S.C. § 158) for an employer to restrict an employee's right to file charges with the Board, "including through restrictions contained in arbitration agreements"]; *Mercuro v. Superior Court* (2002) 96 Cal.App.4th 167, 176 & fn. 12 ["Workers' compensation and unemployment benefits are governed by their own adjudicatory systems"; as

34

a result, "neither [a WCA nor an EDD claim] is a proper subject matter for arbitration"], citing Lab. Code, § 5300 et seq., Unemp. Ins. Code, § 1951 et seq.)  PAGA claims do not share this characteristic, which calls into doubt whether they are subject to the exception.

Although the parties have not relied on the following presumption, we recognize that "[o]rdinarily, ' "all applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated." ' " (*Torrance v. Workers' Comp. Appeals Bd.* (1982) 32 Cal.3d 371, 378.)  However, it is also the case that "where, as here, the parties to a contract incorporate a law that is to be used at some time in the future (here, at the time the arbitration takes place), the parties are deemed to have contemplated—and hence, consented to—the incorporation of postcontract changes to that law." (*Gallo v. Wood Ranch USA, Inc.* (2022) 81 Cal.App.5th 621, 642; see *Torrance*, at p. 379 [" '[When] an instrument provides that it shall be enforced according either to the law generally or to the terms of a particular . . . statute, the provision must be interpreted as meaning the law or the statute in the form in which it exists at the time of such enforcement.' "].)

Further, "[a] judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction." (*Rivers v. Roadway Express, Inc.* (1994) 511 U.S. 298, 312–313; see also *Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 979 [" '[J]udges do not "create," but instead "find" the law.  A decision interpreting the law, therefore, does no more than declare what the law had always been.' "].)  In this sense, *Viking River*'s holding that

35

"the FAA preempts the [anti-splitting] rule of *Iskanian*" (*Viking River*, *supra*, 142 S.Ct. at p. 1924) is a statement of what the FAA has always meant with regard to the arbitrability of individual PAGA claims.

In the end, we are unable to say with " 'positive assurance' " (*AT&T Techs, supra,* 475 U.S. at p. 650) that the provision Baltazar relies upon withdraws her individual PAGA claims from the scope of disputes the parties agreed to arbitrate. Because the provision remains ambiguous after applying the available principles of contract interpretation, we must resolve our doubt "concerning the scope of arbitrable issues . . . in favor of arbitration." (*Moses H. Cone*, *supra*, 460 U.S. at pp. 24–25; *Lamps Plus*, *supra*, 139 S.Ct. at pp. 1418–1419.)

### 3. *Paragraph 3 Is At Best Ambiguous with Respect to Whether It Permits Baltazar to Pursue Her Individual PAGA Claims in Court*

The parties' next series of contentions focus on an asserted representative action waiver contained in paragraph 3 of the agreement,[5] and on subsequent provisions in the agreement that address the effect of the waiver.

---

[5] For ease of reference, paragraph 3 of the agreement states, in relevant part: "I agree that any claims brought under this binding arbitration Agreement shall be brought in the individual capacity of myself only, and, similarly, any claims brought under this binding arbitration Agreement by the Company shall be brought by the Company only. This binding arbitration Agreement shall not be construed to allow or permit the consolidation or joinder of claims of other claimants, or permit such claims to proceed as a class or collective action. . . . If under applicable law a representative claim under the California Private Attorneys General Act ('PAGA') is found to be unwaivable and such an action is pursued in court, I and the Company agree that any such PAGA claim will be severed and stayed pending resolution of claims that are arbitrable."

Both sides take the position that paragraph 3 of the agreement contains a waiver of the right to bring a representative action. They stumble, however, in their efforts to identify the contract language that embodies this waiver. Baltazar cites paragraph 3 for the proposition that the parties' agreement had a "representative action waiver." Ace Parking, also referencing paragraph 3, contends that when Baltazar signed the agreement, she "waived her substantive and procedural rights to bring a class, collective, *or representative* action against Ace Parking." But the sentence in paragraph 3 that Ace Parking is referring to actually says, "By signing this agreement, I am agreeing to waive any substantive or procedural rights that I may have to bring or participate in an action brought on a *class or collective* basis." The word "representative" does not appear in this sentence. We cannot pretend that it does. (*Levi Strauss & Co. v. Aetna Casualty & Sur. Co.* (1986) 184 Cal.App.3d 1479, 1486 ["In construing a contract, the court's function is to ascertain and declare what, in terms and substance, is contained in that contract, and not to insert what has been omitted."].)

However, the first sentence of paragraph 3 of the agreement arguably operates as a waiver. It states, "I agree that any claims brought under this binding arbitration Agreement shall be brought in the individual capacity of myself only, and, similarly, any claims brought under this binding arbitration Agreement by the Company shall be brought by the Company only." That any claims brought under the agreement can only be "brought in the individual capacity of [her]self only" forecloses the possibility of Baltazar bringing a claim in her capacity as a private attorney general on behalf of the state—a limitation that prevents her from bringing PAGA claims.

The parties agree any contractual waiver of Baltazar's right to bring a PAGA action is unlawful under *Iskanian*, as affirmed in *Viking River*. They

37

take different positions on what must occur next. Ace Parking, relying on *Viking River*, contends we must address the illegality by applying the severability clause[6] in paragraph 5 of the agreement (which states, "If any term or provision or any portion of this Agreement is deemed invalid or unenforceable, it shall be severed and the remainder of this Agreement shall be enforceable"), and compel Baltazar's individual PAGA claim to arbitration, as required by paragraph 2. Baltazar, on the other hand, relies on the last sentence of paragraph 3 (stating, "If under applicable law a representative claim under the [PAGA] is found to be unwaivable and such an action is pursued in court, I and the Company agree that any such PAGA claim will be severed and stayed pending resolution of claims that are arbitrable."). She refers to this provision as a "PAGA savings clause"; for the sake of clarity, so will we.[7] Baltazar contends *Viking River* does not control our interpretation of the agreement in this case, because the agreement at issue in *Viking River* did not include a PAGA savings clause. She asks us to enforce the PAGA savings clause and conclude that it allows her entire action, including her individual and non-individual PAGA claims, to proceed in court.

We agree with Baltazar that *Viking River* does not control our interpretation of the parties' agreement. For one thing, the severability clause in *Viking River* was materially different from the severability clause here; it provided that "if the waiver provision is invalid in some respect, any

---

6    "A severability clause 'evidence[s] the parties' intent that, to the extent possible, the valid provisions of the contract[ ] be given effect, even if some provision is found to be invalid or unlawful.' " (*Nickson, supra,* 90 Cal.App.5th at p. 130, fn. 6.)

7    In adopting Baltazar's label, we do not also adopt her interpretation of the provision.

38

'portion' of the waiver that remains valid must still be *'enforced in arbitration.'*" (*Viking River*, *supra*, 142 S.Ct. at p. 1925, italics added.) The italicized language was interpreted to support compelling the employee's individual PAGA claims to arbitration. (*Ibid*.) Similar language does not appear in the severability clause in the parties' agreement. For another, the *Viking River* court did not construe an agreement with a provision like the PAGA savings clause. (See *ibid*.) *Viking River* thus does not address the issues at hand. (*B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 11 [" ' "[C]ases are not authority for propositions not considered." ' "].)

Turning to the provisions relied on by the parties, although we accept that paragraph 3 of the agreement contains language that operates as a waiver of Baltazar's right to bring a representative claim (and therefore a PAGA claim), and PAGA waivers are unlawful, we disagree with the parties with respect to how the agreement should be interpreted to address the illegality. Contrary to Baltazar's assertions, we cannot simply ignore the severability clause in favor of the PAGA savings clause. The clauses are not mutually exclusive, and disregarding the severability clause in favor of the PAGA savings clause would render the severability clause without effect. (Civ. Code, § 1641 ["The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."].) The severability clause applies "[i]f any term . . . or any portion of this Agreement is deemed invalid or unenforceable[.]" Because this condition has been met, we implement the severability clause by severing the first sentence of paragraph 3 in part to the extent it operates as a PAGA waiver. (See *Galarsa*, *supra*, 88 Cal.App.5th at p. 650 [severing invalid waiver of representative claims in arbitration agreement pursuant to severability clause and *Viking River*].)

39

Severing the PAGA waiver does not render the PAGA savings clause ineffective. The savings clause is triggered "[i]f under applicable law *a representative claim under* [*PAGA*] is found to be unwaivable *and* such an action is pursued in court[.]" (Italics added.) Both aspects of this condition have been satisfied, irrespective of the severance of the PAGA waiver. Accordingly, the next clause, which is the provision Baltazar relies on, takes effect. It requires "*any such PAGA claim* [to] be severed and stayed pending resolution of claims that are arbitrable." (Italics added.)

What must occur at this juncture obviously depends on what the parties meant by "*any such PAGA claim*." (Italics added.) The first interpretative step is obvious: "any such PAGA claim" is a reference to the earlier phrase, "a representative claim under [PAGA]." But what does "a representative claim under [PAGA]" mean? Because "representative" has dual meanings, this phrase could be referring to either (1) any PAGA claim, since all PAGA claims are representative in that the plaintiff who asserts them does so on behalf of the state, or (2) only non-individual PAGA claims, since these claims can also be labeled as "representative" and they are also brought "under [PAGA]."

The provision as a whole anticipates severing and staying the "representative claim under [PAGA]" pending resolution of "claims that are arbitrable." Arguably, what the parties meant by "representative" within this provision can be gleaned by considering the scope of "claims that are arbitrable." As we have discussed, paragraph 2 of the agreement must be construed to require arbitration of Baltazar's individual PAGA claims. The "representative" claims to be severed and stayed would therefore constitute the remaining PAGA claims that are not covered by the agreement to arbitrate—i.e., Baltazar's non-individual PAGA claims. This seems to be the

most natural way of reading the provision, and it is the interpretation that has the benefit of giving full effect to paragraph 2. (Civ. Code, § 1641.)

At the same time, one could also reasonably interpret "*a representative claim under* [*PAGA*]" to be a reference to the earlier, waived representative claims. (Italics added.) Under this reading, the scope of the PAGA claim to be severed and stayed in court would gain its meaning from the scope of the earlier, waived claims. Since the earlier waiver operates as a wholesale waiver of the right to bring any PAGA claim, this reading would suggest "representative claim under [PAGA]" means any PAGA claim, whether individual or non-individual. Under this interpretation, all of Baltazar's PAGA claims, both individual and non-individual, would remain in court; none would be arbitrable. However, while this construction of the PAGA savings clause may seem reasonable in isolation, it fails to give effect to paragraph 2, which requires arbitration of Baltazar's individual PAGA claims. This is therefore a disfavored interpretation of paragraph 3. (Civ. Code, § 1641.)

Finally, Baltazar contends the "fact that [she] opted out of the PAGA waiver in a prior [2013 arbitration] agreement show[s] that she did not consent to arbitrating her PAGA claim, in whole or in part." We disagree. Although we may consider parol evidence to construe ambiguity in an agreement (Code Civ. Proc., § 1856), " '[t]he paramount consideration [in the interpretation of contracts] is the intention of the contracting parties ". . . as it existed at the time of contracting" ' " (*Burch v. Premier Homes, LLC* (2011) 199 Cal.App.4th 730, 743; see Civ. Code, § 1636 ["A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."]). Six years' time separates the two agreements. We cannot assume,

41

particularly in the absence of factual support (such as a declaration from Baltazar, which was not provided), that the 2013 agreement is evidence of Baltazar's mindset in 2019. Also, Baltazar's argument ignores that it is the mutual intent of the parties that matters. (Civ. Code, § 1636.) Even if we were to accept her contention as true, it would not establish the intent of Ace Parking.[8]

In sum, we conclude that the most reasonable interpretation of the PAGA savings clause is that it requires Baltazar's individual PAGA claims to be arbitrated while her non-individual PAGA claims are severed and remain in court. To the extent the PAGA savings clause is susceptible of a second reasonable interpretation, it is arguably ambiguous with respect to whether it requires arbitration of Baltazar's individual PAGA claims. Once again, we resolve the ambiguity in favor of arbitration. (*Moses H. Cone, supra*, 460 U.S. at pp. 24–25; *Lamps Plus, supra*, 139 S.Ct. at pp. 1418–1419.)

---

[8] After she submitted her respondent's brief on appeal, Baltazar filed letters with this court citing two new appellate decisions pursuant to California Rules of Court, rule 8.254. We have reviewed both decisions and find them inapposite. At oral argument before this court, Baltazar's appellate counsel cited one of the decisions (*Duran v. EmployBridge Holding Co.* (2023) 92 Cal.App.5th 59) and contended it addressed a PAGA carve-out similar to the PAGA savings clause. We disagree. The arbitration agreement in *Duran* included a waiver that stated, "claims under PAGA . . . are not arbitrable under this Agreement." (*Duran*, at p. 66.) This waiver is unlike the parties' PAGA savings clause, which adds the ambiguous descriptor "representative" to the phrase "claim under . . . [PAGA]." Because *Duran* involved materially different contractual language, it does not guide our interpretation of the parties' agreement in this case.

42

4. *The Second Sentence of Paragraph 5 Does Not Exempt Baltazar's Individual PAGA Claims from Arbitration*

Finally, Baltazar relies on paragraph 5 of the agreement, which states, in part, "[u]nder no circumstances shall this Agreement be construed to allow arbitration on a class, collective, representative or other similar basis." Citing this provision, she asserts "the parties agreed that under *no circumstances* would a PAGA claim be subject to arbitration."

We disagree with Baltazar's assertion, the validity of which depends on the meaning of "representative" in the quoted provision. "[R]epresentative" in this context is ambiguous. It could be referring to a claim maintained by Baltazar in her capacity as a private attorney general (which would include all PAGA claims), or it could be referring to the claims she might assert on behalf of employees other than herself (which would only include non-individual PAGA claims). If the word has the first meaning, then all PAGA claims are excluded from arbitration. If it has the second meaning, only non-individual PAGA claims are excluded, with the result that Baltazar's individual PAGA claim is arbitrable.

Because "representative" in this context is ambiguous, we may rely on maxims of contract interpretation. A doctrine used to interpret an ambiguous term that appears in a list with other, known terms is *noscitur a sociis*, " 'i.e., it is known from its associates.' " (*Jackson v. Kaiser Foundation Hospitals, Inc.* (2019) 32 Cal.App.5th 166, 174.) "Under this rule, ' " [a] word of uncertain meaning may be known from its associates and its meaning "enlarged or restrained by reference to the object of the whole clause in which it is used." ' " ' " (*Coast Restaurant Group, Inc. v. Amguard Ins. Co.* (2023) 90 Cal.App.5th 332, 344.) " ' " ' "In accordance with this principle of construction, a court will adopt a restrictive meaning of a listed item if acceptance of a more expansive meaning would make other items in the list

43

unnecessary or redundant, or would otherwise make the item markedly dissimilar to the other items in the list." ' " ' " (*Ibid.*)

Applying this maxim of interpretation to the provision relied on by Baltazar tends to suggest the term "representative" embraces only her non-individual PAGA claims. Starting with the term "class," a class action is an action in which one or more individual plaintiffs "sue or defend for the benefit of all." (Code Civ. Proc., § 382.) The named plaintiff is a party to the action and has claims that are typical of the class he or she represents. (See *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021.) In a class action, the plaintiff acts as a representative only to the extent she represents the interests of absent class members. If class certification is denied, the plaintiff may proceed with her individual claims, which she then maintains for herself only. (See, e.g., *In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 760 [when class certification is denied, " 'in theory, the individual plaintiff's action can go forward' "].)

As for the term "collective," collective actions are "actions involving opt-in provisions[.]" (*Haro v. City of Rosemead* (2009) 174 Cal.App.4th 1067, 1072 [discussing a collective action brought under the Fair Labor Standards Act (FLSA)].) Collective actions include FLSA actions, as well as "minimum-wage and overtime pay actions under the Labor Standards Act, equal-pay suits under the Equal Pay for Equal Work Act, and age-discrimination actions for non-federal employees under the Age Discrimination in Employment Act." (7B Wright & Miller, *Federal Practice and Procedure* (3d ed. 2023) § 1807.) A significant difference between collective actions and class actions is "that every plaintiff who opts in to a collective action has party status, whereas unnamed class members in [Federal] Rule [of Civil Procedure] 23 class actions do not." (*Ibid.*)

44

Thus, class and collective actions are "representative," but only in the sense and to the extent the plaintiff represents the interests of absent aggrieved others. They are not "representative" in the sense that the plaintiff sues not as herself but as a private attorney general, as in a qui tam action (or PAGA action) where the plaintiff acts on behalf of the state no matter what the nature of the underlying claims and injuries might be. (*California Business & Industrial Alliance v. Becerra* (2022) 80 Cal.App.5th 734, 742 ["A qui tam action is ' "[a]n action brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive." ' "].) Specifically in the case of PAGA actions, the plaintiff acts on behalf of the state even where she only alleges individual PAGA claims based on Labor Code violations she personally suffered. This is unlike class or collective claims, where to the extent no other individual's claims are joined via opt-ins or class certification, the plaintiff has only an individual claim for relief, which is not asserted on behalf of any other.

Comparing the word "representative" with "class" and "collective" thus leads to the conclusion "representative" has the narrower of the two possible meanings: "representative" in the sense of asserting claims that arise from the injuries of others. This conclusion in turn suggests the provision Baltazar is relying on only prohibits arbitration of her non-individual PAGA claims.

In sum, we disagree with Baltazar's contention the parties agreed in paragraph 5 of the agreement that "under *no circumstances* would a PAGA claim be subject to arbitration." The provision's disallowance of "representative" arbitration appears to encompass only non-individual PAGA claims. Because we cannot say " 'with positive assurance' " (*AT&T Techs, supra,* 475 U.S. at p. 650) that paragraph 5 precludes arbitration of

45

Baltazar's individual PAGA claims, we must conclude that it does not have this effect.

C.   *Summary:  Interpretation of the Parties' Arbitration Agreement*

Baltazar's individual PAGA claims are plainly encompassed by the provision in paragraph 2 of the agreement that broadly requires arbitration of "all disputes that may arise out of or be related in any way to [her] employment."  The agreement is ambiguous with respect to whether the exception to arbitration for "claims that are not subject to arbitration under current law" was intended to incorporate the anti-splitting rule of *Iskanian* and exempt all PAGA claims from arbitration.  We are compelled to resolve this ambiguity in favor of compelling arbitration.  (*Lamps Plus*, *supra*, 139 S.Ct. at p. 1419; *Granite Rock*, *supra*, 561 U.S. at p. 301; *Moses H. Cone*, *supra*, 460 U.S. at pp. 24–25.)  To the extent the agreement is also ambiguous with regard to whether it was intended to permit Baltazar's entire PAGA action, or only her non-individual PAGA claims, to proceed in court in the event "a representative claim under the [PAGA] is found to be unwaivable," we construe this ambiguity in favor of arbitration as well.  (*Lamps Plus,* at p. 1419; *Granite Rock,* at p. 301; *Moses H. Cone,* at pp. 24–25.)  Finally, we interpret the word "representative" in paragraph 5 as only prohibiting arbitration of non-individual PAGA claims.  The net result of all of these determinations is that Baltazar must be compelled to arbitrate her individual PAGA claims.

We therefore conclude the trial court reached the incorrect result when it denied Ace Parking's motion to compel arbitration.  We will reverse the court's November 18, 2022 minute order denying the motion to compel arbitration, and we will instruct the court to enter a new order granting Ace Parking's motion to compel arbitration in part and denying it in part and

compelling Baltazar to arbitrate her individual PAGA claims only. In light of *Adolph*, *supra*, 14 Cal.5th 1104, Ace Parking's motion must be denied to the extent it requested dismissal of Baltazar's non-individual PAGA claims. On remand, the court must deny Ace Parking's motion to the extent it requested dismissal of Baltazar's non-individual PAGA claims.

## DISPOSITION

The trial court's November 18, 2022 minute order denying Ace Parking's motion to compel arbitration and to dismiss Baltazar's non-individual PAGA claims (order) is reversed. On remand, the court is instructed to enter a new order (i) granting Ace Parking's motion to compel arbitration in part and denying it in part, (ii) compelling Baltazar to arbitrate her individual PAGA claims only, and (iii) denying Ace Parking's motion to the extent it requested dismissal of Baltazar's non-individual PAGA claims. Each side shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

DO, J.

WE CONCUR:

DATO, Acting P. J.

KELETY, J.

47